**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

|  |  |
|---|---|
| CENTENE PHARMACY SERVICES, INC., <br><br>     *Plaintiff,* <br><br> v. <br><br> CAREMARKPCS HEALTH, L.L.C. and CVS CAREMARK PART D SERVICES, L.L.C., <br><br>     *Defendants.* | No. 4:24-cv-804 MAL |

**MEMORANDUM AND ORDER**

Before the Court is Defendants' Motion to Dismiss, Doc. 22. Plaintiff Centene Pharmacy Services, Inc. sued Defendants CaremarkPCS Health, LLC and CVS Caremark Part D Services, LLC, for breach of contract and declaratory judgment seeking to compel an assignment of certain antirust claims pursuant to a cooperation provision in the parties' agreements. But that provision does not entitle Centene to an assignment of those claims. The Court **GRANTS** the defendants' motion to dismiss, Doc. 22.

**Background[1]**

Centene Pharmacy Services, Inc., ("Centene") is a managed care and health insurance provider that offers pharmacy benefits to its members. Doc. 21 at ¶¶ 1–2. To manage its pharmacy benefits, Centene hired CaremarkPCS Health, LLC and CVS Caremark Part D Services, LLC (collectively, "Caremark"). *Id.* at ¶ 3. The parties' relationship was "governed by the Pharmacy Claims Processing Agreement

---

[1] All facts pleaded in the complaint are assumed true when deciding a motion to dismiss under Rule 12(b)(6). *Bell Atlantic Corp. v. Twombly,* 500 U.S. 544, 556 (2007).

('Pharmacy Agreement') and the Prescription Benefit Services Agreement for Medicare Part D ('Part D Agreement') (collectively, the 'Agreements')," *id.,* under which Caremark provided pharmacy benefit services to Centene's members. *Id.* at ¶ 3–5. The relationship worked like this: Centene's members would fill prescription drugs at pharmacies like CVS. *Id.* at ¶ 31. CVS would then submit claims for those prescriptions to Caremark for processing. *Id.* at ¶ 32. And then Caremark would use money from a Centene bank account to pay CVS for the drugs dispensed to Centene's members on behalf of Centene at prices determined by the Agreements. *Id.* at ¶ 5, 30–33.

Centene alleges that during the term of the Agreements, "the Department of Justice exposed a sprawling price-fixing conspiracy between generic pharmaceutical manufacturers to illegally raise prices, including for drugs acquired by Centene's members and paid for using Centene's earmarked bank account." *Id.* at ¶ 6. Centene also alleges that even though it "ultimately paid for the drugs its members bought at CVS pharmacies, including overcharges stemming from the conspiracy, it lacks federal antitrust standing to sue for those losses under the Sherman Act and certain state antitrust laws." *Id.* at ¶ 7.

To deal with this situation, Centene alleges "the Agreements require Caremark to assign any claims to [Centene] where only a Caremark Affiliate has standing to pursue the claims." *Id.* And according to Centene, the price-fixing conspiracy triggered those assignment conditions because "CVS Pharmacy is a Caremark Affiliate with exclusive standing to pursue federal antitrust claims over Centene's purchases at CVS pharmacies." *Id.* Thus, Centene believes "Caremark must [] assign those federal and state antitrust claims." *Id.* Centene requested that Caremark cause CVS to assign the generic drug antitrust claims under the Agreements, but Caremark has refused. *Id.* at ¶ 8.

In support of its claim for assignment, Centene relies on the Agreements' cooperation provision. *Id.* ¶¶ 17a, 17b. That provision provides that:

> In any case where Client, any Client Affiliate or any Plan Sponsor
> suffers a Loss due to a manufacturer's, pharmacy's or other Person's

2

> acts or omissions and only Caremark or its Affiliate has contractual privity or legal standing to assert the applicable claim or cause of action, if so requested by Client in writing, Caremark shall, or shall cause its Affiliate(s) as applicable to, subrogate or assign such claim or cause of action to Caremark, its Affiliate, or the Plan Sponsor, as applicable, and shall take all such actions as client shall reasonably request to enable Client, its Affiliate or any Plan Sponsor to prosecute such claim or cause of action, recover such Losses; provided, however, that Caremark and its Affiliates shall be permitted to retain their rights in any such claim or cause of action to the extent of any Losses suffered by them from the same acts or omissions.

*Id.* at ¶ 17a.[2]  "Losses" is broadly defined in the Agreements as "all claims, liabilities, demands, damages, losses, costs, indebtedness, liens, deficiencies, obligations, causes of action, lawsuits, administrative proceedings, investigations, audits, judgments, penalties, responsibilities, fines, costs, charges or expenses, including reasonable attorneys' fees and expenses."  *Id.* at ¶ 23.

After Caremark refused to cause CVS to assign the antitrust claims, Centene sued Caremark in state court for breach of contract and declaratory relief seeking to compel the assignment.  *Id.* at 12–14.  Caremark then removed the case to this Court based on diversity and federal question jurisdiction.  Doc. 1.  Caremark now moves to dismiss Centene's Petition, arguing that it has no obligation to cause CVS to assign the claims under the plain text of the parties' Agreements and background principles of antitrust law.  Doc. 23 at 2, 6–7.

## Legal Standard

Caremark has moved to dismiss Centene's complaint under Federal Rule of Civil Procedure 12(b)(6) for "fail[ing] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint to eliminate actions "which are fatally flawed in their legal premises . . . thereby sparing litigants the burden of unnecessary pretrial and

---

[2] A substantively identical provision appears in both Agreements.  *Compare* Doc. 21 at ¶ 17a (quoting the Pharmacy Agreement *with* Doc. 21 at ¶ 17b (quoting the Part D Agreement).

trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (citing *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989)). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Where the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008).

## Analysis

Centene asserts two claims in its petition: a breach of contract claim and a declaratory relief claim. Doc. 21 at 12, 13. But both claims raise the same issue—do the Agreements contractually obligate Caremark to cause CVS to assign its antitrust claims to Centene?

Centene suggests that California law applies in this case because of the choice-of-law clauses in the Agreements.[3] Doc. 25 at 6. Caremark does not appear to dispute this. *See* Doc. 26 at 3 n.2, 4–5 (citing California law on contract interpretation in support of their arguments). In diversity jurisdiction cases, this Court applies the choice-of-law rules of the forum state: here, Missouri. *See Cicle v. Chase Bank USA*, 583 F.3d 549, 553 (8th Cir. 2009) ("Federal courts sitting in diversity apply the choice-of-law rules of the forum state."). Under Missouri's choice-of-law rules, choice-of-law clauses in a contract are generally enforceable. *Id.* Thus, the Court applies California law.

### A. Breach of Contract

The Court starts with Centene's breach of contract claim. To demonstrate breach of contract under California law, a plaintiff must show "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

---

[3] Section 14.8 of the Pharmacy Agreement and Section 15.8 of the Part D Agreement, as recounted in Centene's petition, provides that the Agreements "shall be governed by, construed and enforced in accordance with the Laws of the State of California (without regard to its conflict of laws rules)." Doc. 21 ¶ 17d.

defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman,* 51 Cal. 4th 811, 821 (2011) (citing *Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 830 (1968)). At issue here is the third element—breach.

Centene alleges that "Caremark breached its contractual obligations . . . when it refused to cause CVS Pharmacy to timely assign its federal and direct-purchaser state antitrust claims for [Centene's] purchases through CVS pharmacies." Doc. 21 at ¶ 44. But Caremark thinks that, under the plain language of the Agreements, Centene is not entitled to an assignment of those claims. Doc. 23 at 2, 7. If true, Caremark's refusal to cause CVS to assign the claims is not a breach of the Agreements, and Centene's breach of contract claim must be dismissed.

To determine whether there is a contractual obligation to assign the claims at issue—and therefore, whether Centene's claim must be dismissed—the Court starts (and ends) with the words of the contract themselves. Under California law, "the interpretation of a contract must give effect to the 'mutual intention' of the parties." *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647 (2003). If possible, the parties' "mutual intention" should be inferred "solely from the written provisions of the contract" itself. *Id.* "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 950 (9th Cir. 2002) (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990) (citations omitted)). And the "language . . . must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995). Applying those principles to the language at issue here, the Court finds that Centene is not entitled to an assignment of CVS's antitrust claims.

**1. CVS may retain claims for any "Losses" suffered by them.**

Under the cooperation provision, claims must be assigned when Centene has suffered a "Loss" and only Caremark or its Affiliate has "contractual privity or legal standing to assert the applicable claim or cause of action[.]" Doc. 21 at ¶¶ 17a, 17b

(excerpting Section 14.27 of the Pharmacy Agreement and Section 15.27 of the Part D Agreement); *see also id.* at 68, 863–64 (the cooperation provisions themselves). But the provision goes on to expressly allow Caremark and its Affiliates to ***"retain their rights in any such claim . . . to the extent of any Losses suffered by them[.]"*** *Id.* at 68, 864.  Interpreting this provision in its "ordinary and popular sense," its "clear and explicit meaning" allows Caremark and its Affiliates to keep claims for "any Losses" they suffered—excluding those claims from assignment.[4] Being "permitted to retain their rights in such claim[s]" cannot reasonably mean anything else.

Centene disagrees, suggesting that they are entitled to "undivided control" over the prosecution of ***all*** claims for "Losses" suffered by them but do not have standing to assert—even claims for "Losses" suffered by Caremark and its Affiliates. Doc. 25 at 11.  This is true, Centene suggests, despite the express language allowing Caremark and its Affiliate to "retain their rights in any such claim" for any "Losses" suffered by them because that language merely permits Caremark " 'to retain their right in' any portion of the ultimate recovery."  *Id.*  That means Centene thinks the "rights" the Retention Clause refers to is just the right to a portion of the damages and does not include the right to prosecute.  Not so.

"Rights" means rights—all of them.  If the parties intended to limit the Retention Clause to Caremark and its Affiliate's financial interest in its claims for losses suffered by them, they would have said so.  Instead, they chose to allow Caremark and its Affiliates "to retain their rights in any such claim" without any language limiting the "rights" to be retained.  Absent limiting language, the "rights" to be retained most naturally refers to nothing short of the full bundle of rights typically associated with complete ownership of a legal claim—including the right to

---

[4] *See Pension Tr. Fund*, 307 F.3d at 949–50 (providing that the "clear and explicit meaning" of contractual language, interpreted in its "ordinary and popular sense" controls judicial interpretation unless the language is used "in a technical sense" or has a "special meaning" given to it by usage).  Neither party argues that the language in this clause is used "in a technical sense" or has a "special meaning" given to it by usage, so the "clear and explicit meaning" controls.

prosecute the claim.  Nothing in the cooperation provision suggests otherwise.  Read ordinarily, the provision allows Caremark and its Affiliates to retain complete ownership of claims for any "Losses" it suffered.

### 2.  CVS's antitrust claims are for "Losses" suffered by them.

Because Caremark and its Affiliates *may* retain claims "to the extent of any Losses suffered by them," the dispositive question becomes whether the antitrust claims Centene seeks are for "Losses" suffered by Caremark or its Affiliates, and to what "extent" those Losses are suffered by Caremark or its Affiliates.  *See supra* part A.1.; Doc. 21 at ¶¶ 17a, 17b.  Those claims are excluded from mandatory assignment "to the extent of any Losses suffered by [Caremark or its Affiliates] from the same acts or omissions."  *Id.*

The claims Centene seeks are CVS's federal and direct-purchaser state antitrust claims.  Doc. 21 at ¶ 44. CVS—Caremark's affiliate—is currently litigating those claims against generic drug manufacturers that allegedly engaged in price-fixing conspiracy that illegally raised the prices of drugs.  *Id.* at ¶ 38.  Caremark claims that—as a matter of antitrust law—CVS suffered the full extent of the "Losses" from the price-fixing scheme because CVS directly purchased the drugs at illegally inflated prices, suffering overcharge damages.  Doc. 23 at 8–9 (citing *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977)).  Centene contends that CVS suffered zero "Losses" from the drug makers' antitrust violations because it passed on all of the overcharges to Centene.  Doc. 25 at 7, 13–14, n.7.

But it is hard to see how CVS's antitrust claims could not be for "Losses" it suffered.  The Agreements define "Losses" broadly to include almost every type of conceivable injury, including "all claims, liabilities, demands, damages, losses, costs, indebtedness, liens, deficiencies, obligations, causes of action, lawsuits, administrative proceedings, investigations, audits, judgments penalties, responsibilities, fines, costs, charges or expenses, including reasonable attorneys' fees and expenses."  Doc. 21 at 26, 817.  Antitrust injuries certainly fall within that sweeping definition.  *See* INJURY, Black's Law Dictionary (12th ed. 2024) (defining

"antitrust injury" as "damage, loss, or harm caused by anticompetitive conduct that violates antitrust laws."). The law is clear that direct purchasers like CVS suffer the *full extent* of the antitrust injury caused by anticompetitive price-fixing manufacturers. As the Supreme Court said almost a half century ago, "direct purchasers [are] injured to the full extent of the overcharge paid by them." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977).

Centene addresses this issue only in a footnote at the end of its response to the motion to dismiss. Doc. 25 at 14, n. 7. Centene argues that even if Caremark has the right to recover all of the damages under *Illinois Brick*, this does not mean that Caremark "suffered" an injury or damages. *Id..* But nothing in *Illinois Brick* suggests direct purchasers are merely allowed to recover damages for an injury that they did not suffer. *Illinois Brick* shows the opposite—direct purchasers are injured and damaged by overcharges resulting from antitrust violations. *See Illinois Brick Co.*, 431 U.S. at 746 ("holding direct purchasers to be ***injured to the full extent*** of the overcharge paid by them") (emphasis added). And so does Supreme Court precedent old and new. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 491 (1968) (rejecting argument "to limit the general principle that the victim of an overcharge ***is damaged*** within the meaning of [Section 4 of the Sherman Act] to the extent of that overcharge.") (emphasis added); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 204 (1990) ("[W]e hold that only the [direct purchaser] has the cause of action because it alone has ***suffered injury*** within the meaning of [Section] 4.") (emphasis added). Thus, Caremark and its Affiliates may retain claims "to the extent of any Losses suffered by them," *see supra* part A.1., and *Illinois Brick* means Caremark's Affiliate, CVS, suffered Losses "to the full extent of the overcharge paid by them." *Illinois Brick Co.*, 431 U.S. at 746. There is nothing left to assign.

Contrary to Centene's arguments, *see* Doc. 25 at 8–13, nothing in the cooperation provision[5] shows that the parties intended to avoid this result. As a general principle of contract interpretation, parties to a contract "are presumed or

---

[5] Doc. 21 at 68, 863–64.

deemed to have contracted with reference to existing principles of law," and "contractual language must be interpreted in light of existing law." 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:19 (4th ed.). Specifically, under California law, "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation that that effect, as if they were expressly referred to and incorporated." *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 296–97 (Cal. 2008) (quotation marks and citations omitted). "Existing law includes decisions of the appellate courts interpreting statutes." *California Ass'n of Highway Patrolmen v. Dep't of Personnel Admin.*, 229 Cal. Rptr. 729, 735 (Cal. Ct. App. 1986) (quotation marks and citations omitted). At the time the Agreements were executed, the direct-purchaser rule articulated in *Illinois Brick* had been blackletter antitrust law for decades. Yet the parties chose not to include any language in the cooperation provision that would have required Caremark and its Affiliates to assign their direct-purchaser antitrust claims despite being deemed "injured to the full extent of the overcharge paid by them." *Illinois Brick*, 431 U.S. at 746–46. Absent such language, the plain meaning of the cooperation provision controls.

**3. Centene is not entitled to an assignment of CVS's antitrust claims.**

Having established that CVS may retain claims for any losses it suffered—and that CVS suffered the full extent of the loss from the antitrust violations—CVS must be able to retain its antitrust claims. Any other conclusion would contradict black letter antitrust law and the ordinary meaning of the parties' agreements. Yet Centene urges the Court to read the cooperation provision differently for several additional reasons.

*First*, Centene argues that the requested assignment fits the cooperation provision's purpose. Doc. 25 at 8–9. To Centene, the provision fixes the "disconnect between who the law allows to sue for losses and who actually experiences those losses." *Id.* at 9. Presumably, Centene thinks an assignment of CVS's antitrust claims accomplishes that. Even so, subjective purpose does not control

9

interpretation of the provisions. "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,'" does. *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 950 (9th Cir. 2002) (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990) (citations omitted)). And again, the ordinary meaning of the assignment provisions allows CVS to retain claims for "Losses" they suffered, and—under the direct-purchaser rule articulated in *Illinois Brick*—CVS suffered "Losses" to "the full extent of the overcharge" caused be the drug makers antitrust violations. 431 U.S. at 746. Thus, CVS may retain its antitrust claims regardless of the subjective purpose of the assignment provisions.

*Second*, Centene assures the Court that direct purchasers like CVS often give assignments to indirect purchasers. Doc. 25 at 10. But even if these types of assignments are commonplace, that does not change the fact that the plain text of the cooperation provision here does not entitle Centene to CVS's antitrust claims.

*Third*, Centene claims that its requested assignment would be consistent with the rationales for the direct-purchaser rule articulated in *Illinois Brick*. *Id.* at 11–12. Specifically, Centene suggests that an assignment would simplify litigation by ensuring only one party prosecutes the claims, keeps the damages calculation straightforward without any risk of double recovery, and encourages antitrust suits. *Id.* Putting the veracity of these claims aside, the fact of the matter is that under the direct-purchaser rule, CVS suffered "Losses" to the full extent of the overcharge caused by the drug makers price-fixing scheme. *Supra* at 7–9. Whether an assignment of CVS's claims to Centene would achieve some of the goals that justify the direct-purchaser rule is immaterial to what this Court must decide. The Court's job is to "give effect to the 'mutual intention' of the parties[.]" *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647 (2003). And where possible, that intention should be inferred solely from the written provisions of the contract. *Id.* Because the written provision at issue here is clear, the Court must give it effect. The cooperation provision expressly allows CVS to retain claims for any "Losses" it suffered, and, under the direct-purchaser rule, CVS's antitrust claims are for "Losses" it suffered. Thus, CVS may retain its antitrust claims. Whether an

10

assignment of those claims would be consistent with the rationales for the direct-purchaser rule does not change the rule itself, nor does it change the consequences of the rule here. Under the ordinary meaning of the cooperation provision, and the direct-purchaser rule articulated in *Illinois Brick*, Centene is not entitled to CVS's antitrust claims.

Finally, Centene argues that reading the cooperation provision to not entitle Centene to CVSs' antitrust claims would render the provision "meaningless" in "every case." Doc. 25 at 3, 12–14, nn.6–7. Under California law, contracts should generally be interpreted to avoid rendering a provision meaningless. *See Brandwein v. Butler*, 218 Ca. App. 4th 1485, 1507 (2013) ("[W]hen interpreting a contract, we strive to interpret the parties' agreement to give effect to all of the contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable.") (citing 11 Williston on Contracts (4th ed. 2012) § 32:5 at 427). But that is not a concern here. CVS's antitrust claims are excluded from assignment here because of a unique aspect of federal antitrust law: the direct-purchaser rule. That does not mean that every type of claim is also excluded from assignment. The direct-purchaser rule is an unusual creature of federal antitrust law, and its application is limited to antitrust claims.[6] There is no reason to believe that the generic cooperation provision here could never cover any claim. But even were that the case, the interpretive presumption against meaninglessness is only a presumption. It can be overcome. And here, the meaning, at least in this case, is quite clear.

---

[6] Specifically, it is limited to federal antitrust damages claims and state direct-purchaser antitrust damages claims in the minority of states that follow the federal direct-purchaser rule. Indirect purchasers like Centene are free to pursue claims for damages under both state antitrust laws in most states as well as state consumer protection statutes. In fact, that is exactly what indirect purchasers are doing in the multidistrict litigation over the generic drug makers alleged price-fixing scheme. *See, e.g.,* End-Payer Amended Class Action Complaint, *1199SEIU National Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.*, No. 2:18-cv-2401-CMR (E.D. Pa. Apr. 1, 2019), Doc. No. 153 ¶¶ 714–83 (asserting damages claims under the antitrust statutes of 27 states and the District of Columbia and damages claims under the consumer protection statutes of 29 states and the District of Columbia).

## B. Declaratory Relief Claim

Centene's Petition also seeks "a judicial determination and declaration of Caremark's obligations under the Agreements . . . and a declaration that Caremark must assign certain federal and state antitrust claims."  Doc. 21 at ¶ 53.  Because the Court has determined that Caremark does not have an obligation under the agreements to cause CVS to assign the requested antitrust claims, this duplicative claim must be dismissed as well.  *See Reeves v. 21st Century Centennial Ins. Co.*, 4:22-cv-270-JAR, 2022 WL 2209412, at *4 (E.D. MO. June 21, 2022) (explaining that where a claim for declaratory judgment "is duplicative of [a] breach of contract claim," the resolution of such claim "would necessarily resolve her claim for declaratory relief" and "must be dismissed").

Conclusion

**IT IS HEREBY ORDERED** that Defendants CaremarkPCS Health, L.L.C. and CVS Caremark Part D Services, L.L.C.'s Motion to Dismiss, Doc. 22, is **GRANTED**.  Plaintiff Centene Pharmacy Services, Inc.'s claims are **DISMISSED, with prejudice.**  A separate order of dismissal will accompany this memorandum and order.

**SO ORDERED,**

This 14th day of April, 2026.

_Maria A. Lanahan_
MARIA A. LANAHAN
UNITED STATES DISTRICT JUDGE